UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
v.                              )       No. 3:19-CR-208-TAV-HBG-7
                                )
THOMAS O. MACKEY,               )
                                )
                Defendant.      )

**REPORT AND RECOMMENDATION**

This case is before the undersigned pursuant to 28 U.S.C. § 636 and the Rules of this Court, to address Defendant's Motion to Suppress Evidence [Doc. 90], filed on April 28, 2020.

The Court conducted an evidentiary hearing on Defendant's motion to suppress on August 31, 2020. Assistant United States Attorney ("AUSA") Alan Kirk appeared on behalf of the Government, while Attorney Michael Menefee represented the Defendant, who was also present. At the conclusion of the testimony, the Court took the matter under advisement and allowed the parties the opportunity to file post-hearing briefs. Defendant filed a post-hearing brief on October 12, 2020 [Doc. 123], while the Government also filed a brief [Doc. 124] on the same day.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 90] be **GRANTED IN PART**.

I.      **INTRODUCTION**

Defendant seeks [Doc. 90] to suppress all evidence seized from the warrantless entry and search of his home on November 22, 2019. Defendant challenges the November 22nd search when law enforcement was at his home attempting to serve an arrest warrant on his adult son, Thomas

K. Mackey. Defendant asserts that law enforcement used a crowbar to break into the front door of his home, as well as the padlocked door into his bedroom, and that Detective Hollifield "subsequently lied in his Affidavit for Search Warrant and that [Defendant's] home was broken into and searched hours before the search warrant was issued." [*Id.* at 2].

The Government responds [Doc. 93] that law enforcement lawfully searched the residence through the state search warrant. First, the Government claims that law enforcement may enter a home with an arrest warrant when they have a reasonable belief that the subject of the arrest warrant is on the premises. Next, the Government asserts that law enforcement subsequently obtained a search warrant based upon probable cause uncovered during the execution of the arrest warrant. Lastly, the Government claims that if the Court finds that the search warrant was invalid, law enforcement relied upon the search warrant in good faith and the evidence should not be suppressed.

Following the testimony at the hearing, Defendant maintains [Doc. 123] that the evidence resulting from the search of his home was obtained in violation of the Fourth Amendment. Defendant first claims that law enforcement was not justified to make the initial entry into his home, incident to the arrest of his son, Thomas K. Mackey. Additionally, Defendant asserts that Detective Hollifield made several intentionally false statements in his affidavit for the subsequent search warrant by repeatedly stating that he had probable cause to believe that Defendant, Mary Mackey, and Benjamin Ramsey were involved in a conspiracy to distribute methamphetamine.

The Government submits [Doc. 124] that law enforcement had a reasonable belief that Thomas K. Mackey was present at Defendant's home during the execution of the arrest warrant. Additionally, the Government contends that the state search warrant was based on probable cause.

2

## II.     TESTIMONY AT THE EVIDENTIARY HEARING

At the August 31 hearing, the Government presented the testimony of David Norton, Levi Morton, and Steffan Hollifield and introduced seven exhibits.[1]  Defendant presented the testimony of Thomas K. Mackey and Benjamin Ramsey and introduced two exhibits.  The Court summarizes the witness's testimony and introduced exhibits as follows.

The Government first presented the testimony of Officer David Norton, who is currently employed with the Jefferson County Sheriff's Department and assigned to the 4th Judicial Drug and Violent Crime Task Force, as well as the FBI HIDTA Task Force.  [Tr. 6].  Officer Norton stated that he became involved in the instant case through his investigation of Codefendant Andy Warren, a known meth dealer, and the task force performed several controlled buys.  [Tr. 7].  Officer Norton testified that he began listening to Codefendant Andy Warren's jail phone calls with Codefendant Michelle Sinclair Elvir after his arrest for the possession of a firearm by a convicted felon.  [*Id.*].  Officer Norton stated that during these intercepted phone calls, Codefendant Andy Warren was instructing Codefendant Elvir on how to still sell drugs on his behalf, as well as to take a firearm and trade it to his supplier, although he did not directly name the supplier.  [Tr. 8].

When asked about his efforts to identify the supplier, Officer Norton testified that another intercepted phone call from the jail showed a Thomas Mackey as being a subscriber—an individual that had set up an account in the jail call system.  [*Id.*].  Officer Norton stated that during these jail calls, Codefendant Andy Warren arranged for Codefendant Elvir to meet Thomas Mackey to purchase methamphetamine.  [*Id.*].

---

[1] The transcript [Doc. 113] of the evidentiary hearing was filed on September 17, 2020.

3

Codefendant Elvir was later stopped by law enforcement with a substantial amount of methamphetamine in her car. [Tr. 9]. Officer Norton then interviewed Codefendant Elvir at the Jefferson County Sheriff's Department, confronted her about the intercepted jail calls, and she identified a picture of Thomas Mackey, calling him "Miami." [*Id.*]. Officer Norton clarified that this individual was Defendant's son, Thomas K. Mackey.[2] [Tr. 9–10]. Additionally, Officer Norton stated that Thomas K. Mackey was indicted in this case, which was accompanied by an arrest warrant. [Tr. 10].

Next, the Government introduced as Exhibit 1 the arrest warrant and return for Thomas K. Mackey, and Officer Norton testified that he helped serve the arrest warrant on November 22, 2019. [Tr. 10–11]. Officer Norton detailed the steps taken to identify the location of Thomas K. Mackey, stating that Thomas K. Mackey's name and phone number were run "through the portal," and the jail system listed a Powdermill Road address in Gatlinburg. [Tr. 11]. A driver's license for Thomas K. Mackey matched the same address. [Tr. 12]. Law enforcement subsequently investigated the address, including driving by it on several occasions, and law enforcement investigated it "a little, small amount," but Officer Norton testified that they "thought there was something not right with the address." [*Id.*]. Officer Norton detailed that law enforcement then ran Thomas K. Mackey's information through a database called TLO, which uncovered three addresses: an apartment in Sevierville, the Powdermill Road address, and 4004 French Broad Circle ("4004 French Broad"). [*Id.*].

Officer Norton testified that further investigation of the apartment in Sevierville was not

---

[2] Officer Norton clarified that Defendant, Thomas O. Mackey, and his son, Thomas K. Mackey, both share the alias of Miami. [Tr. 10].

fruitful, as law enforcement was unable to find any of the vehicles matching the description given by Codefendant Elvir when she met with "Miami" to purchase methamphetamine and trade a firearm. [*Id.*]. Codefendant Elvir previously described two vehicles used by Miami to law enforcement—a Cadillac and a Volkswagen. [Tr. 13]. Officer Norton stated that law enforcement did not locate these vehicles at the first two address, but the director of the 4th Judicial Drug Task Force, Mack Smith, observed the Cadillac at the French Broad address. [*Id.*]. Additionally, Officer Norton testified that Smith witnessed Thomas K. Mackey walking away from a vehicle and entering the residence, a trailer, at 4004 French Broad. [Tr. 14].

Officer Norton then detailed the steps made to execute the arrest warrant. Officer Norton stated that arrest teams were set up for different locations for the individuals to be arrested on that day, and Thomas K. Mackey was in Sevier County. [Tr. 14–15]. The 4th Judicial Drug Task Force coordinated with Lieutenant Levi Morton with the Sevier County Sheriff's Office Street Crimes Unit for assistance in executing the warrant. [Tr. 15]. Officer Norton testified that law enforcement met at the residence at 4004 French Broad, and Sevier County officers knocked on the door while was at the back corner of the residence. [*Id.*]. The Government then introduced several photographs of the residence as Exhibit 2 to the hearing. [Tr. 16]. Officer Norton described the outside of the residence, as well as a Cadillac, which was one of the vehicles mentioned by Codefendant Elvir. [Tr. 17].

Officer Norton then detailed that while Lieutenant Morton was knocking on the front door of the trailer, another member of law enforcement behind him stated "something to the effect of . . . they're inside," so Officer Norton then went toward the front door of the trailer. [*Id.*]. He stated that he thought somebody was inside of the trailer, as he heard the other members of law

enforcement giving commands.  [*Id.*].  Officer Norton testified that once he went inside the doorway of the trailer, he saw the Sevier County deputies go to the back bedroom, come out, and there was a dog inside of the residence.  [*Id.*].

However, there was not a person located inside of the trailer, and Officer Norton stated that law enforcement was inside of the trailer for approximately two minutes.  [Tr. 19].  Officer Norton detailed that the officers walked from the front door, to a living room and kitchen, and back into a doorway with additional rooms.  [*Id.*].  He stated that there was a door to the right that had a padlock on it, but that no member of law enforcement looked inside of the room at this time.  [Tr. 20].  Officer Norton detailed that law enforcement secured the dog in a back room, and then obtained a pry bar from their truck to open the hatch to the room that was padlocked.  [*Id.*].  Additionally, Officer Norton testified that he exited the trailer when Lieutenant Morton stated that there was a padlock on one of the rooms, stated that there were "still some buildings" to the back, and he went to "hold that area."  [*Id.*].  During this time, while Officer Norton was not inside of the trailer, he stated that Lieutenant Morton came back outside and stated that the room was clear— with the whole timeline of events taking place in approximately three minutes.  [Tr. 20–21].

Next, Officer Norton detailed that law enforcement cleared several outbuildings, one to the left and one to the right of the trailer.  [Tr. 21].  Officer Norton stated that law enforcement approached the rectangular, white-framed outbuilding, which he described "as like a man cave," with couches and television, where law enforcement found Thomas K. Mackey and another individual.  [Tr. 21–22].  Law enforcement then checked the identification of these individuals. [Tr. 22].  Additionally, Officer Norton stated that while he was inside at the front of the trailer, he could smell marijuana, but it smelled more like unsmoked marijuana.  [*Id.*].  He then detailed that

when he was at the outbuilding, there was a strong smell of marijuana like marijuana smoke. [*Id.*].

Once Thomas K. Mackey was identified, he was subsequently placed under arrest. [Tr. 23]. Officer Norton stated that when he told Thomas K. Mackey that he had a warrant for his arrest, Thomas K. Mackey told him that he was not the right Mackey, that his father's name was Thomas Mackey, and "he's the one," with Officer Norton testifying that Thomas K. Mackey said "I think he said he sells marijuana." [*Id.*]. Thomas K. Mackey was subsequently read his Miranda rights, and later told law enforcement that his dad went by Miami. [Tr. 23–24]. The other individual, identified by Officer Norton to be a stepbrother (Benjamin Ramsey), asked and received permission to call his father. [Tr. 24].

Officer Norton testified that he stated at this time that they needed to leave the scene, because a collection point was set up at the Jefferson County Sheriff's Department with another co-defendant for the initial appearances for several Defendants. [*Id.*]. Officer Norton told Thomas K. Mackey that law enforcement had intercepted certain phone calls where his name came up, to which Thomas K. Mackey told him that his father was also Thomas Mackey and it was not him. [*Id.*]. Before transporting Thomas K. Mackey, law enforcement located Codefendant Elvir again, and she identified a picture of Thomas K. Mackey as being Miami. [Tr. 24–25]. Officer Norton testified that before he left 4004 French Broad, Lieutenant Morton asked if he minded if the Sevier County Sheriff's Office applied for a search warrant for the residence due to the strong smell of marijuana. [Tr. 25].

Officer Norton then transported Thomas K. Mackey to the federal courthouse for his initial appearance. [Tr. 26]. However, he stated that at the initial appearance, Codefendant Elvir stated that Thomas K. Mackey was not the right individual, even after identifying his picture twice. [*Id.*].

7

Officer Norton spoke with the U.S. Attorney's Office, Thomas K. Mackey was released, and Officer Norton then received a phone call that the Sevier County Sheriff's Office had obtained a search warrant for the residence and found a large amount of methamphetamine and heroin. [*Id.*]. The Government noted the minute entry for the initial appearance/arraignment of Thomas K. Mackey, which details that it took place from 3:00 p.m. to 3:50 p.m. [*Id.*]. Officer Norton testified that he received the call from the Sevier County Sheriff's Office close in time to the initial appearance. [*Id.*]. Law enforcement then worked with Codefendant Elvir and her attorney regarding the identification of Defendant—Thomas O. Mackey. [Tr. 27]. Officer Norton testified that Codefendant Elvir stated that Mami looked older than that, and subsequently identified the picture of Defendant. [*Id.*].

Officer Norton also stated that he noticed surveillance cameras at 4004 French Broad, a DVR was seized, and the data on the hard drive did not match the data on the DVR. [*Id.*]. After obtaining consent from Defendant to redownload the DVR, video files were downloaded from the surveillance cameras. [Tr. 28–29].

On cross-examination, Officer Norton testified that he checked Thomas K. Mackey's address in the state driver's license database, which came up with a Powdermill Road address. [Tr. 30]. However, Officer Norton stated that he did not ever knock on this door or leave his card at this address. [*Id.*]. Officer Norton testified that he was not sure the exact date where another member of law enforcement saw Thomas K. Mackey entering 4004 French Broad, but it was approximately in October, after the arrest of Codefendant Elvir. [Tr. 30–31]. When asked about further investigation into 4004 French Broad, Officer Norton stated that law enforcement searched the TLO database and talked to the Sevier County Sheriff's Office Street Crime unit for additional

8

information on Miami, who provided that he was a supposed methamphetamine dealer.  [Tr. 31].

Officer Norton testified that the Jefferson City Police Department had performed some controlled buys on the main target in this case, as well as a confidential informant buying drugs from another target, and both individuals stated that their supplier was Miami.  [*Id.*].  Additionally, Codefendant Elvir told law enforcement that when she would meet with Miami to be resupplied on drugs and when she traded the gun, they would meet at a car wash in the Kodak area, as well as that they would sometimes meet at a Food City in the Kodak area, which was close to 4004 French Broad.  [*Id.*].

Officer Norton stated that law enforcement assumed that Thomas K. Mackey's girlfriend also likely lived at 4004 French Broad Circle, but he did not have any information on who all lived at the address.  [Tr. 32].  Officer Norton also detailed that law enforcement would go by 4004 French Broad periodically, and the two vehicles that they had been given descriptions of—the Cadillac and the Volkswagen—were both at the residence at different times.  [Tr. 32–33].  Law enforcement also performed several drive-bys on the Sevierville address and the Powdermill Road address.  [*Id.*].

When asked about the date of the arrest, Officer Norton testified that before entering the trailer, he did not hear any noise from the outbuildings.  [Tr. 33–34].  When law enforcement entered the outbuilding, Thomas K. Mackey and Ramsey were laying down on two couches, they were patted down, but no firearms or drug contraband were found on their persons.  [Tr. 34–35].  Officer Norton testified that he did not recall any contraband or weapons being found within arm's reach of the couch.  [Tr. 35].  Officer Norton clarified that when he heard Officer Kenny Lodwick say "they're in the house," it meant that law enforcement had gotten into the house, and he thought

9

that they had found someone because he heard them giving commands. [Tr. 35–36]. However, Officer Norton stated that he did not hear anything inside of the house that made him think that someone was inside other than Lodwick's statement and hearing law enforcement give commands. [Tr. 36].

Officer Norton testified that there were two doors from the outside to the inside of the house, and upon entering the front door, he was standing in the living room. [Tr. 36–37]. Additionally, Officer Norton stated that after going through the front door, to the right, was a door leading to a bedroom (which was padlocked), but that there were not any doors leading to the outside from this room. [Tr. 37–38]. Here, Officer Norton clarified that the padlock was on the outside of the door, such that if someone was to lock the door, they would have had to come from outside of the room. [Tr. 38]. Officer Norton restated that an officer popped the lock so he could check the room, but before the lock was broken off, he did not hear anything inside of the room. [Tr. 39]. Officer Norton detailed that he did not knock on the door to this room, but he could not state whether anyone else did, although he heard members of law enforcement identify themselves upon entering the trailer. [*Id.*].

When asked about his initial interaction with Thomas K. Mackey, Officer Norton testified that during this time he had contacted the United States Attorney's Office for counsel on how they should proceed, as well as because there was a misspelling on the warrant. [Tr. 40]. Officer Norton stated that Codefendant Elvir looked at Thomas K. Mackey's picture again before they got to Knoxville and verified that he was the right guy. [Tr. 41]. Officer Norton testified that Codefendant Elvir was shown a picture of Thomas K. Mackey once in his presence during the interview, as well as again on the day of the arrest. [*Id.*]. Officer Norton stated that he arrived to

4004 French Broad at approximately 7:00 or 8:00 in the morning, and that he left this address at approximately 9:00, as he was only there for "probably 30 minutes." [Tr. 43].

When asked about the DVR, Officer Norton stated that he subsequently learned from talking to Sevier County officers that there were recordings, and a search warrant was obtained for the DVR. [Tr. 43–44]. He obtained it from Kenny Lodwick, but did not have the power cord, a replacement power cord was obtained, and the DVR was kept in the evidence room in Jefferson County. [Tr. 44–45]. Officer Norton testified that he had not watched any videos on the physical DVR, but he had watched what was downloaded from the DVR. [Tr. 45]. Officer Norton stated that he did not have any chain of custody documents with him at that time, but that it was more than a week from when the DVR was seized on the day of the search to when it was in his possession. [Tr. 46]. Officer Norton reviewed the recordings from the days leading up to the arrest but stated that he did not watch them in their entirety. [Tr. 47].

On re-direct examination, Officer Norton stated that the Cadillac was seen outside of 4004 French Broad on the day of the arrest, but that he did not see the Volkswagen. [Tr. 48]. However, Officer Norton stated that a picture from the day of the arrest, Exhibit 2-7, showed that the Volkswagen was parked inside of a garage on the property. [Tr. 49].

Upon questioning from the Court, Officer Norton detailed that the TLO is a database that supplies different names associated with a phone number, and that he believed that it reviews billing information. [Tr. 49–50]. Officer Norton also clarified that law enforcement had not located the individual they were searched for when the padlock was removed from the room inside of the trailer. [Tr. 50].

The Government then presented the testimony of Lieutenant Levi Morton with the Sevier

11

County Sheriff's Office. [Tr. 52]. Lieutenant Morton stated that he was the lieutenant over the Street Crimes Unit, and that he was contacted by the 4th Judicial Drug and Violent Crime Task Force to assist in serving a federal arrest warrant on November 22, 2019. [Tr. 53]. He and Detective Hollifield assisted in executing the arrest warrant. [*Id.*]. The Government then introduced as Exhibit 6 the Sevier County Dispatch Report [Tr. 54], which stated that Lieutenant Morton and Detective Hollifield were en route to serve the arrest warrant at 8:41:47 a.m. [Tr. 55]. Lieutenant Morton further also further detailed the overall timeframe of events on November 22, 2019. [*Id.*].

Lieutenant Morton testified that when he arrived at the scene, along with Detective Hollifield and another member of law enforcement, they went to the front door of the residence. [*Id.*]. He stated that Detective Hollifield knocked on the door, and they announced that they were with the Sevier County Sheriff's Office. [Tr. 55–56]. Lieutenant Morton detailed that after Detective Hollifield knocked on the door a couple of times, it slowly opened inward. [Tr. 56]. After announcing themselves again and hearing no reply, law enforcement performed a protective sweep throughout the house. [Tr. 57]. Lieutenant Morton testified that he first came into the living room, with a kitchen to the left, and a hallway past the kitchen to the right side of the trailer. [*Id.*].

Additionally, Lieutenant Morton stated that upon entering the residence, he could smell the odor of burnt marijuana, as well as that there was a dog inside of the residence with feces and urine on the floor. [Tr. 58]. Upon first entering the residence, to the right, there was a door with a padlock on it, and Lieutenant Morton detailed that while he cleared the rest of the residence, another member of law enforcement focused on that door. [*Id.*]. Lieutenant Morton then retrieved a pry bar, popped the lock off, and went into the bedroom to make sure no one was present inside

12

of the room. [*Id.*]. Here, Lieutenant Morton testified that the bed pretty much took up the whole room, but he checked the corners, behind the door, under the bed, in the closet, and moved the clothes around to make sure no one was inside of the room. [Tr. 59]. Lieutenant Morton stated that the protective sweep, in total, took less than five minutes. [*Id.*].

After clearing the residence, Lieutenant Morton stated that he went outside, other members of law enforcement had opened a shed, and he then heard that they had made contact with someone. [*Id.*]. Lieutenant Morton testified that when he was on the front porch by the front door, he noticed there were cameras throughout the residence, and that it is common practice to adjust cameras when executing a warrant. [Tr. 60]. After reviewing video evidence, Lieutenant Morton stated that he placed the crowbar on the right center ledge of the porch after he popped the lock to the bedroom. [Tr. 61]. Lieutenant Morton reviewed a clip of Thomas K. Mackey leaving the trailer on November 22nd and stated "when I observed him open the door, I didn't notice that he turned it. It looked more just like a push. When he did shut it, looked like it did secure, but like I said, whenever Detective Hollifield knocked on the door," it swung open. [Tr. 63].

After Thomas K. Mackey was transported for his initial appearance, Detective Hollifield prepared a search warrant for the residence and Lieutenant Morton had a patrol deputy sit with Ramsey to make sure no one entered the residence. [Tr. 64]. Another officer, Deputy McCarter, relieved the first deputy. [Tr. 64–65]. The search warrant was then obtained from Judge Ogle, and the Government introduced a copy of the state search warrant as Exhibit 5. [Tr. 65].

Lieutenant Morton testified that he returned to 4004 French Broad at around lunch time to execute the search warrant. [*Id.*]. After obtaining the warrant, three members of law enforcement went to the property to execute the search warrant, with Detective Alex Alonso taking pictures

13

before and after the search. [Tr. 66]. Lieutenant Morton stated that his main focus was Defendant, Thomas O. Mackey, and his bedroom which was previously locked, due to the statements of Thomas K. Mackey. [*Id.*]. Lieutenant Morton summarized Thomas K. Mackey's statements as that law enforcement had the wrong guy, as well as that it was his dad who goes by Miami and sells marijuana. [*Id.*]. Additionally, Lieutenant Morton identified that Ramsey had made a statement that he knew that Defendant sold weed. [*Id.*]. Lieutenant Morton stated that Ramsey said he was not sure if Defendant used any hard-core drugs, although he suspected it. [Tr. 67].

Lieutenant Morton then reviewed a photograph of the previously locked bedroom, with the bed and a dresser to the left of the door. [*Id.*]. Lieutenant Morton identified a green bag in the photograph [Exh. 2-11] as where a large amount of methamphetamine was found inside of the dresser. [*Id.*]. Lieutenant Morton detailed that digital scales were also found inside of the green bag, as well as that two bags of marijuana, one bag of heroin, drug paraphernalia, and a Visa debit card were also found within the padlocked bedroom. [Tr. 68]. A wall safe was also located in the closet of the bedroom behind hanging clothes. [Tr. 68–69]. Lieutenant Morton testified that law enforcement originally tried to search the wall safe after receiving a code from Defendant, but after being unable to open the safe, it was taken to the Pigeon Forge Fire Hall to be opened. [Tr. 69]. A small bag and some papers were found within the safe. [*Id.*]. Lieutenant Morton stated that Ramsey had contacted Defendant at law enforcement's request, and there was a phone call and text messages about the safe code. [*Id.*].

Lieutenant Morton testified that the search was totally complete, including going to the fire hall, close to 5:00 p.m., in the mid-afternoon. [Tr. 70]. Additionally, Lieutenant Morton stated that he contacted Officer Norton after they found the bag of methamphetamine, and a report was

14

completed by the Sevier County Sheriff's Office—which was introduced as Exhibit 7. [*Id.*].

Lieutenant Morton testified that upon entering the bedroom, the right side of the room appeared to be Defendant's side—with men's clothes and shoes, while the left side of the room had female clothes and a vanity with a mirror. [Tr. 71]. There was a large television, as well as a smaller screen next to it that had the security cameras from outside displayed on it. [*Id.*]. Lieutenant Morton stated that he is familiar with the odor of marijuana, and that upon entering the residence, he smelled a burnt smell of marijuana. [Tr. 72].

On cross-examination, Lieutenant Morton stated that he was not familiar with the smell of methamphetamine, and that he would not know if he smelled any methamphetamine inside of the residence. [Tr. 73–74]. Lieutenant Morton stated the protective sweep of the residence took approximately five minutes, but it took longer to get Thomas K. Mackey into custody. [Tr. 74]. After the protective sweep, members of law enforcement were talking under a carport outside of the residence about the Cadillac, which was "Mackey Senior's." [Tr. 74–75]. Lieutenant Morton testified that after the protective sweep, he was not inside of the residence until executing the search warrant. [Tr. 75]. However, he could not recall whether any other members of law enforcement re-entered the residence. [*Id.*].

Next, Lieutenant Morton testified that in addition to the call from Officer Norton, he believed that the suspect was at the residence because he heard a conversation from an individual that was in jail about a "guy named Miami who had lived off of Rich Creek in that vicinity," as well as that members of the 4th Judicial Drug Task Force stated there was an individual named Thomas Mackey who goes by Miami. [*Id.*]. Lieutenant Morton stated that his office began doing surveillance on their own, observed the parked maroon Cadillac, and "the tag [came] back on it to

15

Mr. Mackey, so we knew we had the right address." [Tr. 76]. Lieutenant Morton stated that he became aware that there were two Thomas Mackeys when Thomas K. Mackey was taken into custody, and that he believed they were looking for Thomas Mackey through the license plate registration. [*Id.*].

Lieutenant Morton stated that the officers met at Bud's Gun Shop prior to heading to the location, that he was present but not a part of pulling Thomas K. Mackey and Ramsey out of the outbuilding, and that he only briefly talked to Thomas K. Mackey. [Tr. 77]. However, Lieutenant Morton testified that he spoke with Ramsey, including about Defendant possibly selling marijuana. [Tr. 78]. Lieutenant Morton stated that he had not heard of Ramsey before arriving at the location, and that neither Thomas K. Mackey nor Ramsey made any incriminating statements about Ramsey. [*Id.*]. Here, Lieutenant Morton detailed that while he was speaking with Ramsey, he did not have any information that Ramsey was involved in any conspiracy to sell drugs. [*Id.*].

Lieutenant Morton stated that he was involved in searching the female's side of the padlocked bedroom and found a small bag of methamphetamine and a methamphetamine pipe in this area. [Tr. 79]. Additionally, Lieutenant Morton testified that he told Ramsey that he found drugs that might belong to his mother after the search. [Tr. 80]. Ramsey was trying to contract Defendant after the execution of the search warrant when law enforcement found the wall safe. [*Id.*]. Lieutenant Morton stated that he felt like something was missing because law enforcement had found a large amount of drugs but not a large amount of money. [*Id.*]. Lieutenant Morton also stated that Ramsey was very compliant when talking to law enforcement, and that several members of law enforcement spoke with him. [Tr. 80–81]. Additionally, Lieutenant Morton stated that he was not aware of any member of law enforcement that went inside of the residence

from after Thomas K. Mackey's arrest to the obtaining of the search warrant. [Tr. 81].

When questioned about the DVR, Lieutenant Morton stated that he did not recall who unplugged it, and that after obtaining the DVR, it was taken back to the Sheriff's office and placed in evidence. [Tr. 82–83]. Lieutenant Morton testified that no one had access to the DVR, he did not recall how long he had it, and that it was locked up in their evidence. [Tr. 83]. However, Lieutenant Morton stated that he had not seen the evidence log for the DVR. [*Id.*]. Lieutenant Morton stated that he had reviewed certain electronic files taken from the DVR. [Tr. 83–84].

On re-direct examination, Lieutenant Morton stated that after leaving the property initially, officers were detailed to secure the scene, Deputy Rutledge arrived at 9:39, Deputy McCarter arrived at 11:33, Deputy Rutledge left at 11:35, and Detective McCarter left at approximately 3:13, at around the same time as Lieutenant Morton and Detective Hollifield. [Tr. 85]. Lieutenant Morton testified that he did not use his crowbar to pop open the front door. [Tr. 86].

The Government then called Detective Steffan Hollifield, who works with the Sevier County Sheriff's Office Street Crimes Unit. [Tr. 87]. Detective Hollifield stated that he arrived at 4004 French Broad at approximately 8:40 a.m. on November 22, 2019, along with Lieutenant Morton and members of the 4th Judicial Drug Task Force. [Tr. 88]. Detective Hollifield testified that when they approached the residence, he knocked on the door, and while he was knocking and announcing they were with the Sheriff's office, the door opened. [*Id.*]. Then, Detective Hollifield detailed that as they made entry into the residence, he saw a bedroom door that was padlocked from the outside immediately to the right. [Tr. 89]. Detective Hollifield stated that while knocking on the door, the storm glass door was already open, and he described his knock on the door hitting the door with the back of his fist. [*Id.*]. Additionally, he testified that the door swung upon quickly,

"almost like it was not shut all the way." [Tr. 90].

Detective Hollifield described the protective sweep he performed of the residence, stating that he noticed there was a dog inside; that there was a living room directly as he walked in, as well as a kitchen further ahead on the left, and another hallway towards a bathroom and at least one other bedroom; and he made his way through the trailer looking for areas where someone could have been hiding. [*Id.*]. Detective Hollifield stated that after clearing the rest of the trailer, law enforcement decided to get a pry bar to open the final room with the padlock on the outside. [Tr. 90]. Detective Hollifield described the padlock as a latch attached to a door frame and stated that Lieutenant Morton popped the lock off. [Tr. 91]. After entering the room, a bed took up most of the room, and one officer stayed to the right of the bed, while Detective Hollifield went to the left side of the room and looked behind clothes on the left side and under the bed. [*Id.*]. Detective Hollifield testified that he was in the room for no more than twenty seconds and was in the main residence from two to five minutes. [Tr. 90–91]. Additionally, Detective Hollifield stated that he smelled an odor of marijuana upon entering the residence. [Tr. 91].

After the main residence was swept, Detective Hollifield detailed that officers with the 4th Judicial Drug Task Force swept the garage and storage area and found Thomas K. Mackey and Ramsey. [Tr. 92]. Detective Hollifield testified that he spoke with both individuals, and Thomas K. Mackey stated that his father goes by Miami, that he was not Miami, and that his father sold marijuana and kept it in the locked bedroom. [Tr. 93]. Additionally, Detective Hollifield stated that after Thomas K. Mackey was transported away, he and Lieutenant Morton spoke with Ramsey, "and his statements corroborated what Mr. Kyle Mackey had said and with the odor inside is that his step-father Thomas Mackey goes by Miami and that he sells weed." [Tr. 93–94]. At

18

this time, Detective Hollifield called the District Attorney's office about obtaining a search warrant for the residence and the property.  [Tr. 94].

The Government then reviewed Exhibit 5—the search warrant affidavit and state search warrant.  [Tr. 93].  Detective Hollifield stated that his signature was on the affidavit.  [*Id.*]. Detective Hollifield detailed that he went back to his office and estimated that the judge signed the search warrant at approximately 2:00 p.m.  [Tr. 94].  After the search warrant was obtained, Detective Hollifield, Lieutenant Morton, and another member of the Street Crimes Unit, returned to 4004 French Broad to execute the warrant.  [Tr. 95].  Detective Hollifield reviewed several photographs taken of the residence during the execution of the search warrant.  [*Id.*].  In particular, Detective Hollifield stated that he found the green bag, found to contain methamphetamine, in a dresser.  [Tr. 96].

On cross-examination, Detective Hollifield was questioned regarding his preparation for the hearing and whether there was anything in the reports or search warrant that he would like to correct.  [Tr. 98].  Detective Hollifield stated that the only error, was using "to" instead of "two." [*Id.*].  He then testified that he knew to go to 4004 French Broad because of information received from the 4th Judicial Drug Task Force members, but that he had previously engaged in surveillance on this address.  [98–99].  Detective Hollifield stated that he ran the tags of one of the vehicles at the property, which came back to Defendant.  [Tr. 99].  Additionally, Detective Hollifield testified that he was made aware on November 22, 2019 that Thomas K. Mackey did not live at the residence.  [*Id.*].  Detective Hollifield stated that he was provided with a picture of Thomas K. Mackey before the execution of the arrest warrant, which he believed was his driver's license picture.  [*Id.*].

While reviewing Exhibit 7, the incident report from the Sevier County Sheriff's Office, Detective Hollifield stated that it was compiled on November 22, 2019, and that he was the reporting officer. [Tr. 100]. Detective Hollifield confirmed that the report states that while knocking on the front door of the trailer, the door came open. [*Id.*]. When questioned whether before knocking on the door that there was any indication that Thomas K. Mackey was inside of the trailer, Detective Hollifield testified that there was a burgundy color Cadillac at the scene which belonged to Defendant, but that there were no other indicators. [*Id.*]. Detective Hollifield described his knock on the door as "a hard knock as to make ourselves known that we were there." [Tr. 100]. Detective Hollifield then stated that they did not hear any responses from inside of the trailer while announcing themselves as law enforcement. [Tr. 101]. When asked whether there was any indication that someone was inside of the padlocked bedroom, Detective Hollifield testified that they did not know, and "there definitely could have been somebody in there," but that he did not recall any noise from inside of the bedroom. [*Id.*]. Detective Hollifield stated that a member of law enforcement knocked on the door before entering but received no response. [*Id.*].

Additionally, Detective Hollifield reiterated that there was an odor of marijuana upon entering the trailer, that this was key evidence in obtaining a search warrant, and that he is certified as a clandestine lab tech and has been around methamphetamine. [Tr. 102]. Detective Hollifield stated that "a lot of times [methamphetamine] goes unnoticed" without an odor, while sometimes it has an odor similar to cat urine, but that he did not notice a smell of methamphetamine in the trailer. [Tr. 103]. Detective Hollifield testified that it was a matter of seconds between leaving the trailer and going back to the outbuilding when he heard officers yelling outside, and he did not recall if he patted down Thomas K. Mackey and Ramsey. [Tr. 103–104]. Detective Hollifield

20

stated that there were no guns or contraband found on Thomas K. Mackey or Ramsey. [Tr. 104].

Here, Detective Hollifield also testified that at the point when Thomas K. Mackey made the excited utterance that his father sells marijuana and keeps it in the bedroom with the padlock, the padlock was not still on the door. [*Id.*]. Detective Hollifield testified that when Thomas K. Mackey made this statement, it seemed like he was trying to clarify that law enforcement had gotten the wrong guy. [*Id.*]. Detective Hollifield stated that Thomas K. Mackey did not say the word methamphetamine at any point, implicate Ramsey in any kind of illegal activity, that there was not prior information that Ramsey was involved in any illegal activity, and that Ramsey did not implicate himself when talking to law enforcement. [Tr. 105]. Additionally, Detective Hollifield testified that the statements from Thomas K. Mackey and Ramsey were critical in obtaining a search warrant. [Tr. 106].

Detective Hollifield detailed that he prepared the search warrant, that it took approximately two and a half hours, that it involved a lot of cut and pasting, and that he was in the room when Judge Ogle read and reviewed the warrant for approximately thirty to forty-five minutes. [*Id.*]. When reviewing the affidavit to the search warrant, Exhibit 5, Detective Hollifield stated that he wrote the affidavit, that he has participated in over a hundred investigations involving illicit substances, and further detailed his qualifications. [Tr. 107–108]. Detective Hollifield was questioned regarding language in the affidavit stating that Thomas O. Mackey, Mary Mackey, and Ramsey committed a felony involving a conspiracy to distribute methamphetamine, as well as conspiracy to distribute marijuana. [Tr. 109].

Detective Hollifield stated that Ramsey's name was mentioned because he resided at the residence, and later testified that he could not point to any evidence he relied on to believe that

21

Ramsey was involved in a methamphetamine conspiracy. [Tr. 110]. Detective Hollifield testified that at the time he signed the affidavit, he was not completely sure whether Ramsey was involved in a conspiracy to distribute methamphetamine because this was the first time his name had been brought up and he was at the residence in the outbuilding. [*Id.*]. However, Detective Hollifield stated that he was "leaning towards no," but had been instructed to "mention everyone that resides at the residence in [his] search warrant." [Tr. 110–11]. Similarly, Detective Hollifield testified that there was no evidence in the affidavit to show that Mary Mackey was involved in a conspiracy to distribute methamphetamine. [Tr. 111].

Detective Hollifield stated that it was his understanding that "the indictments we were there serving were for[ ] was a methamphetamine conspiracy," but that he had not seen the indictment. [Tr. 113]. Detective Hollifield testified that when preparing the search warrant, he knew there was a Thomas O. Mackey and Thomas K. Mackey, that Thomas K. Mackey had been arrested on an indictment for a methamphetamine conspiracy, but that there was a little bit of confusion on which Mackey was the Defendant. [Tr. 113–14]. Detective Hollifield stated that he did not believe that he put anything inside of the affidavit that pointed to Defendant, Thomas O. Mackey, being involved in a methamphetamine conspiracy, and that when drafting the document, he did not have any evidence that he forgot to include. [Tr. 114]. Detective Hollifield testified that all three individuals—Defendant, Mary Mackey, and Ramsey—resided in the trailer, and he believed that law enforcement was there under a methamphetamine conspiracy indictment, and that he smelled marijuana. [Tr. 114–15]. Additionally, Detective Hollifield stated that when writing the affidavit, law enforcement had not found the methamphetamine in the house and did not look inside of the drawer when clearing the room. [Tr. 115].

22

Detective Hollifield then testified that either he or Lieutenant Morton was the first to enter the residence, and that he remembers there being damage to the door frame. [*Id.*]. Detective Hollifield stated that he did not believe that any of the officers on scene were wearing a body camera on November 22, 2019. [Tr. 116]. When reviewing a screenshot from security camera footage, Detective Hollifield identified Officer Brandon Rutledge with the Sevier County Sheriff's Office and stated that he had a body camera in the center of his uniform. [Tr. 117].

On re-direct examination, Detective Hollifield reviewed his incident report [Exh. 7], including Ramsey's statements that he was not sure if his stepfather sold anything else (other than marijuana) and that some of the customers at the house look like they could be buying something other than weed. [Tr. 118]. Detective Hollifield testified that in his experience as a law enforcement officer, it is very common that individuals that live where drugs are sold are involved together. [Tr. 119]. Detective Hollifield detailed that the affidavit includes that Defendant had a previous federal narcotics violation, and that he included Mary Mackey and Ramsey in the affidavit because they were both residing at the residence. [Tr. 119–20].

Defendant then called Thomas K. Mackey as a witness. [Tr. 121]. Thomas K. Mackey stated that he was the Defendant's son, and that his current address was 4255 Powdermill Estates Road—where he had lived for a year, including in November of 2019. [Tr. 122]. Thomas K. Mackey stated that this is the address that is on his driving record, but in November of 2019, 4343 Powdermill Estate Road was listed as the address on his driver's license and was where he received mail. [*Id.*]. However, Thomas K. Mackey testified that he never lived at 4004 French Broad Circle—where his father (Defendant), Marlene Ramsey (stepmother), Ramsey (stepbrother), and Gracie Ramsey (stepsister) lived. [Tr. 123]. Thomas K. Mackey stated that he had visited his

23

family "all of the time," including in 2019. [*Id.*]. Additionally, Thomas K. Mackey detailed that on November 22, 2019, he decided to call out from work, and his stepmother asked him to move a television for her. [*Id.*].

Thomas K. Mackey stated that he had moved the television into the house and was sitting in the room using his phone when he heard a loud banging on the door. [*Id.*]. He detailed that he did not make any sudden movements, and law enforcement later came into the shed with their guns drawn. [Tr. 124]. Thomas K. Mackey testified that law enforcement stated that they smelled weed, but that he did not have any marijuana on him, and he was subsequently placed in handcuffs and patted down. [*Id.*]. Here, Thomas K. Mackey stated that law enforcement asked him if he went by Miami, but he said multiple times that it was his father. [*Id.*]. He testified that he first told law enforcement that his name was Thomas Mackey, but that he did not live there, as it was his father's house. [*Id.*]. Thomas K. Mackey then testified that law enforcement said they smelled marijuana, as well as that they had an indictment for him for methamphetamine and heroin. [Tr. 125]. Additionally, Thomas K. Mackey stated that he was familiar with the cameras at the residence, and that there was never a problem with the cameras. [*Id.*].

Thomas K. Mackey then reviewed video footage of him exiting the trailer on November 22, 2019 and stated that he closed the door all the way. [Tr. 125–26]. He testified that if you do not close the door all of the way, "it opens back up" and "automatically opens." [Tr. 126]. Thomas K. Mackey also stated that if the door is not closed and it latches, it swings open. [*Id.*]. He also confirmed that Defendant keeps his bedroom locked, and that it was locked on November 22, 2019. [Tr. 126–27]. When reviewing a photograph of the front door [Exh. 8], Thomas K. Mackey testified that the front door was not in that condition before he was arrested. [Tr. 127].

24

Next, Thomas K. Mackey detailed that after he was pulled out of the shed, he told officers that he was Thomas Mackey, and they then felt like they had the right person. [*Id.*]. He testified that after being placed in handcuffs and patted down, he told law enforcement that he did not live there and that they might be looking for his father, whose name is also Thomas Mackey. [Tr. 128]. Thomas K. Mackey testified that at this point, the officers went back to check, and later said that his name was spelled incorrectly. [*Id.*]. Additionally, he stated that law enforcement "said this was the right place" and "[t]hey knew I lived in 4343," as well as that when asked about methamphetamine charges, he stated that his father goes by Miami. [*Id.*]. Thomas K. Mackey testified that he did not remember saying anything about his father selling weed, but if he did "it was for the fact that they asked [him] where's the weed from," to which he responded that he did not have any marijuana and none was found by him or Ramsey. [*Id.*]. He stated that he was in handcuffs and talked to the officers for approximately twenty-five to thirty minutes while he was standing in front of the Cadillac. [Tr. 129]. Additionally, Thomas K. Mackey testified that while handcuffed he could see the front door, and no one went inside of the trailer while he was there. [*Id.*]. Lastly, he stated that the charges against him were ultimately dismissed. [Tr. 130].

On cross-examination, Thomas K. Mackey stated that he would stay overnight in the detached shed at 4004 French Broad from time to time and would park his car in the driveway. [*Id.*]. However, he testified that he did not sometimes go by the alias Miami or that other people knew him as Miami. [Tr. 131]. Thomas K. Mackey acknowledged that he signed a consent for his phone to be searched, and that on his phone there was evidence that he would purchase marijuana from time to time. [Tr. 131–32]. He also acknowledged that while being detained and arrested, he stated that they were after his father, but denied stating that the house gets a lot of foot

25

traffic. [Tr. 132]. He testified that his father's trailer was an older trailer, and that while handcuffed by the maroon Cadillac, he did not see any officers going in and out of the front door of the trailer. [Tr. 133–34].

Defendant then called Benjamin Ramsey as a witness, who stated that the Defendant was his stepfather, and that he lived with his stepfather, mother, and sister at 4004 French Broad on November 22, 2019. [Tr. 135–36]. When describing the events at issue, Ramsey stated that he remembers being woken up by loud banging, but he and Thomas K. Mackey kept laying down because it was early. [Tr. 136]. He testified that he then heard banging on the door, and law enforcement ripped the door open and identified themselves as police. [*Id.*]. He stated that they asked Thomas K. Mackey if he was Thomas Mackey, he said yes, they placed Thomas K. Mackey in handcuffs, and began questioning both of them in front of the shed. [*Id.*]. Ramsey testified that law enforcement asked Thomas K. Mackey if he went by Miami, to which he responded no, and that his father goes by Miami. [Tr. 136–37]. Thomas K. Mackey was in handcuffs at this time, while Ramsey was not. [Tr. 137]. Ramsey stated that he was asked about traffic at the property, and he stated that there was a lot of traffic because of family members. [*Id.*].

Ramsey testified that it was no more than thirty minutes from the time he was pulled out of the shed to the time when Thomas K. Mackey was taken away. [Tr. 138]. He stated that he was by his brother for the most part of this questioning, and he remembers telling law enforcement "that if there was anything I knew that my dad sold it was weed, but . . . he kept all that away from me." [*Id.*]. Additionally, Ramsey testified that one of the officers asked him to call Defendant to try and get the code for the safe at approximately 10:30 or 11:00 a.m., and Defendant texted him a code, which he relayed to law enforcement no later than 12:00. [Tr. 139].

26

Ramsey then stated that "Officer Levi" told him that his father was involved in a methamphetamine case, and that his mother might also be involved. [Tr. 140]. Ramsey testified that after law enforcement mentioned his mother, he responded, "I don't know" and for the officers to stop speaking to him. [*Id.*]. Additionally, Ramsey testified that he was standing on the porch for this conversation and that he did not believe it was later than noon. [Tr. 140–41]. Ramsey stated that the conversation about his mother was in the same time frame of when the officers asked about the code to the safe. [Tr. 141]. Ramsey stated that his brother, Thomas K. Mackey, was not present for this conversation. [Tr. 142–43].

On cross-examination, Ramsey testified that while in the shed area with Thomas K. Mackey, he heard loud banging at approximately 8:00 or 9:00 a.m. [Tr. 144–45]. Ramsey stated that he was asked if he knew about Defendant selling weed, to which he responded that he did not, and "if there's anything that . . . he may have sold is possibly weed." [Tr. 145]. Additionally, Ramsey testified that he told officers that there was a lot of people at the residence, but that he did not state that "they could be buying something other than weed." [Tr. 146]. He stated that Thomas K. Mackey would stay overnight from time to time at 4004 French Broad. [*Id.*]. Ramsey then testified that he no longer had the message from his stepfather with the code to the safe because it was sent through Snapchat. [Tr. 147–48].

## III. ANALYSIS

Defendant moves [Doc. 90] to suppress all evidence seized during the warrantless entry and subsequent search of his home on November 22, 2019. The Court will first address Defendant's arguments regarding the initial entry into the trailer at 4004 French Broad, and will then review Defendant's claim that Detective Hollifield knowingly and intentionally made several

27

false statements in his affidavit for the search warrant.

### A.    Initial Entry into the Residence

Defendant asserts that law enforcement was not justified to search his home pursuant to the arrest warrant of his son, Thomas K. Mackey.  Defendant contends that an arrest warrant authorizes entry into a dwelling only where the officers executing the warrant have a reasonable basis to believe that the person named in the warrant is present in the residence.  Here, Defendant asserts that law enforcement lacked a reasonable belief that Thomas K. Mackey was present at 4004 French Broad, and therefore could not rely upon the arrest warrant as a basis for justifying their entry into the trailer, as "officers relied upon a single sighting of Thomas Kyle Mackey entering his father's home a month prior."  [Doc. 123 at 7].  Defendant also points to Detective Hollifield's testimony that upon arriving at the residence on November 22, 2019, there was no indication that Thomas K. Mackey was inside of the trailer other than the presence of Defendant's Cadillac.  Therefore, Defendant claims that without entering Defendant's home to execute the arrest warrant of Thomas K. Mackey, law enforcement would not have smelled the odor of marijuana that was subsequently used to obtain the search warrant at issue.

The Government contends [Doc. 124] that law enforcement had a reasonable belief that Thomas K. Mackey was at 4004 French Broad, as "during the investigation, agents ruled out other possible addresses and locations."  [*Id.* at 4].  Additionally, the Government notes that law enforcement had previously seen Thomas K. Mackey at the residence, 4004 French Broad was listed as an address for him on open source databases, and law enforcement observed the two vehicles described by Codefendant Elvir at the property.  *See* [Doc. 93 at 4].

The Sixth Circuit has directed that "[i]n determining whether entry into a third party's

residence without a search warrant is proper to arrest the subject of an arrest warrant, [courts] must consider the framework set forth for warrantless entries in *Payton v. New York*." *United States v. Lewis*, 676 F. App'x 440, 444 (6th Cir. 2017). In *Payton v. New York*, the Supreme Court established that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980); *see, e.g.*, *Lewis*, 676 F. App'x at 444 ("*Payton* established a two-part test requiring that officers have a reasonable belief that the subject of the warrant lives at the place of entry and a reason to believe that the subject of the warrant is inside."). "[A]n arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time." *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) (addressing the standard required for establishing reasonable belief for officers to enter a third-party's dwelling with an arrest warrant).

"The Supreme Court has not defined what 'reasonable belief' means under *Payton*, and the lower courts have taken different approaches in applying the standard." *United States v. Allgood*, No. 17-CR-20327-JTF, 2018 WL 6733957, at *4 (W.D. Tenn. Aug. 17, 2018), *report and recommendation adopted by*, 2018 WL 6178446 (W.D. Tenn. Nov. 27, 2018). While the Sixth Circuit in *Pruitt* appeared to signal its adoption of the reasonable belief standard, it subsequently explained that "[t]he majority's statements in *Pruitt* 'holding' that *Payton* established a lesser reasonable-belief standard were unnecessary to the outcome of the case, and when the facts of the instant case do not require resolution of the question any statement regarding the issue is simply dicta." *United States v. Hardin*, 539 F.3d 404, 415 (6th Cir. 2008) (internal quotations omitted);

29

*see also United States v. Gibbs*, No. 2:10-cr-20053-JPM, 2010 WL 5156433, at *5 (W.D. Tenn. Dec. 14, 2010) (discussing the conflicting case law within the Sixth Circuit regarding the applicable standard and declining to decide which standard applies).

"Lacking a clear statement from the Sixth Circuit . . . the *minimum* showing that must be made is that the officers have a reasonable belief that the subject of the arrest warrant is within the residence at that time." *Id.* (citing *United States v. Stanley*, 351 Fed. App'x 69, 74 (6th Cir. 2009)).

Here, Defendant contends that law enforcement's entry into 4004 French Broad was not valid, as it was unreasonable for officers to believe that Thomas K. Mackey lived at the residence.[3] "The first prong of the standard requires that officers take steps to reasonably ensure that they are not entering the home of a third party in violation of *Steagald*." *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008) (citing *Steagald v. United States*, 451 U.S. 204, 214–15 (1981) (holding that an arrest warrant alone does not authorize officers to enter the home of a third party and that, absent exigent circumstances or consent of the resident, officers must obtain a search warrant before entering the third party's home)); *see, e.g.*, *United States v. Shaw*, 707 F.3d 666, 668 (6th Cir. 2013).

The first test under *Payton*—whether law enforcement had a reasonable belief that Thomas K. Mackey resided at 4004 French Broad—presents a close call before the Court. Officer Norton testified that Codefendant Elvir identified Thomas K. Mackey as "Miami," the individual from whom she had purchased methamphetamine and traded a firearm. [Tr. 9]. The public records

---

[3] While Defendant claimed, prior to the hearing, that his house was searched "hours before the search warrant was issued" [Doc. 90 at 2], it would be proper for law enforcement to perform a protective sweep if the initial entry to the residence was valid. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990).

database identified three potential addresses for Thomas K. Mackey, including 4004 French Broad, and the jail subscriber system and Thomas K. Mackey's driver's license also listed the Powdermill Road address. [Tr. 12]. Officer Norton testified that law enforcement drove by the Powdermill Road address on several occasions, but that "there was something not right with the address" and they were not able to find any of the vehicles matching the description given by Codefendant Elvir. [Tr. 12]. However, the Cadillac and Volkswagen witnessed by Codefendant Elvir were subsequently identified at 4004 French Broad, and Thomas K. Mackey was seen entering the residence. [Tr. 14].

Ultimately, while the Government claims that law enforcement attempted to rule out the other listed addresses for Thomas K. Mackey, they did not engage in an extensive process to reasonably ensure that they were not entering the home of a third party. Officer Norton was unable to detail the steps taken to rule out the other addresses listed for Thomas K. Mackey, including the one listed on his driver's license registration. It appears that law enforcement's belief that Thomas K. Mackey lived at 4004 French Broad was largely based upon surveillance of him at the residence a month before the execution of the search warrant. Therefore, law enforcement arguably did not take reasonable steps to ensure that they were not entering the home of a third party, and likely did not have a reasonable belief that Thomas K. Mackey resided at 4004 French Broad.

Conversely, law enforcement did witness Thomas K. Mackey leaving the residence at 4004 French Broad, and located the vehicles identified by Codefendant Elvir during her meeting with "Miami." Additionally, the Court's analysis of whether law enforcement had a reasonable belief that Thomas K. Mackey resided at 4004 French Broad is muddled by the confusion between Defendant's and his son's names, as well as the subsequent misidentifications by Codefendant

31

Elvir.

However, this finding is not necessary at this time, as the Court finds that, at a minimum, law enforcement did not have a reasonable belief that Thomas K. Mackey was present at 4004 French Broad during the attempted execution of the arrest warrant. As detailed above, Thomas K. Mackey was seen at 4004 French Broad only once by law enforcement—approximately a month before the date of execution of the search warrant.

Therefore, whether law enforcement had a reasonable belief that Thomas K. Mackey was at 4004 French Broad when the search warrant was to be executed hinges largely on the presence of the maroon Cadillac outside of the residence on November 22, 2019. Defendant correctly details Detective Hollifield's testimony that before knocking on the door at 4004 French Broad, the only indicator that Thomas K. Mackey was inside of the trailer was the Cadillac. [Tr. 100]. The Court also notes that the Cadillac is ultimately owned by the Defendant, Thomas O. Mackey.

Officer Norton stated that law enforcement would periodically drive by 4004 French Broad, and the two vehicles that they had been given descriptions of—the Cadillac and Volkswagen—were both at the residence at different times. [Tr. 32–33]. Additionally, Officer Norton testified that the Cadillac was seen outside of 4004 French Broad before the execution of the search warrant. [Tr. 48]. Lastly, Lieutenant Morton stated that surveillance of the maroon Cadillac at the residence, and running of the vehicle tag, came "back on it to Mr. Mackey, so we knew we had the right address." [Tr. 76]. However, Lieutenant Morton also testified that he became aware that there were two Thomas Mackeys when Thomas K. Mackey was taken into custody. [*Id.*].

"The court must look to 'common sense factors' and evaluate the 'totality of the

32

circumstances' to determine whether a reasonable belief existed." *United States v. Allgood*, No. 17-CR-20327-JTF, 2018 WL 6733957, at \*4 (W.D. Tenn. Aug. 17, 2018) (quoting *United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2008)), *report and recommendation adopted by*, 2018 WL 6178446 (W.D. Tenn. Nov. 27, 2018). Much of the applicable case law on law enforcement's reasonable belief that an individual is present at the residence centers on information provided by an informant or confidential tip. For example, the Sixth Circuit has detailed that "[a] common feature of [cases finding sufficient reason to believe] is recent, eyewitness evidence connecting the suspect to the residence, and often even conduct by the suspect that demonstrates a tie to the residence." *Hardin*, 539 F.3d at 421.

In *Hardin*, the Sixth Circuit held that information provided by a confidential informant, standing alone, did not establish that the defendant (Malik Hardin), who had an outstanding arrest warrant, was inside a third party's apartment to even the lesser standard of reasonable belief. *Id.* The informant, whose reliability had been previously established, stated that the defendant might be staying at his girlfriend's apartment and was likely driving a certain vehicle. *Id.* Law enforcement subsequently went to the apartment complex, identified the apartment, noticed a vehicle matched the description nearby, and learned that the apartment was leased to a woman. *Id.* The Sixth Circuit ultimately found that law enforcement "may well have reasonably suspected that Hardin was generally living at this residence, but they had essentially no evidence to indicate that Hardin was then *inside* the apartment." *Id.* at 423–24 (emphasis in original).

Similarly, in *United States v. Lewis*, the Sixth Circuit found law enforcement had sufficient reason to believe the defendant was inside of an apartment at the time of entry where "[o]fficers previously received a tip that Lewis was at the apartment, knew that it was his girlfriend's

apartment, and saw Lewis fleeing from the apartment only a week prior to his eventual arrest," and "[a]lthough the officers did not identify the person they saw looking out of the window as Lewis, there was a witness, as in *Pruitt*, who identified the suspect from a photograph and told police that he or she had witnessed the suspect enter the apartment shortly after the reported shooting." 676 F. App'x 440, 445 (6th Cir. 2017) (citing *United States v. Pruitt*, 458 F.3d 477, 478 (6th Cir. 2006)).

Here, law enforcement had only observed Thomas K. Mackey at 4004 French Broad one time—approximately one month before the time of entry—and largely based their belief on the presence of the maroon Cadillac, as well as 4004 French Broad being listed as one of his addresses on public databases. However, in *Hardin*, the Sixth Circuit found that the identification of a similar vehicle at the apartment complex did not provide evidence to indicate that the suspect was inside of the apartment at that time.

Although law enforcement believed that Thomas K. Mackey was the registered owner of the Cadillac, they did not have a reasonable belief that he was inside of the trailer due to their limited investigation of both the vehicle and 4004 French Broad. Although this analysis is complicated by the similarity between Defendant's and his son's names, the fact that law enforcement did not discover the presence of Defendant highlights their limited investigation into Thomas K. Mackey, and thus their lack of support for their belief that he was present at 4004 French Broad on November 22, 2019. While law enforcement claimed to have observed the Cadillac and Volkswagen at 4004 French Broad on several occasions, and Codefendant Elvir stated that she met with Miami when he was driving a Cadillac and Volkswagen, they did not specifically observe Thomas K. Mackey driving either vehicle. Officer Norton testified that the

34

director of the 4th Judicial Drug Task Force "actually saw Thomas Mackey walking from a vehicle and entering the residence," but he did not state whether Thomas K. Mackey was driving the Cadillac. [Tr. 14]. Further, while Lieutenant Morton claimed that he had heard of an individual named Miami who lived in the area, law enforcement failed to connect Thomas K. Mackey to this address—particularly when the Powdermill Road address was listed on Thomas K. Mackey's driver's license

Ultimately, while the Cadillac was parked at 4004 French Broad on November 22, 2019, law enforcement failed to engage in sufficient investigation of both the vehicle and the residence to establish, under the totality of the circumstances, a reasonable belief that Thomas K. Mackey was within the residence. *See United States v. Allgood*, No. 2:17-CR-20327-JTF-TMP, 2018 WL 6178446, at *2 (W.D. Tenn. Nov. 27, 2018) ("In addition, law enforcement officers must rely on independent investigation and observations of the premises to determine whether a suspect is actually inside the third party's resident before entering the location.") (citing *Pruitt*, 458 F.3d at 483). Law enforcement engaged in limited surveillance of both the vehicle and Thomas K. Mackey and had only observed him at the residence on one occasion. Moreover, the Government did not present testimony detailing Thomas K. Mackey driving the maroon Cadillac; rather, law enforcement just believed that he owned the vehicle due to its registration.[4] *Cf. United States v. Stanley*, 351 F. App'x 69, 73 (6th Cir. 2009) (upholding district court finding that officers had

---

[4] Although Officer Norton claimed to be unaware of the presence of Thomas O. Mackey, Lieutenant Morton also subsequently testified that after the initial protective sweep, while "trying to figure out like where are we at, [and] how did we miss them," law enforcement were "standing under [a carport] talking about the Cadillac that was there, that was Mackey Senior's." [Tr. 74]. However, he also later testified that he was aware that there were two Thomas Mackeys when Thomas K. Mackey was taken into custody. [Tr. 76].

35

reason to believe the defendant was in his apartment where surveillance indicated that the defendant frequently stayed overnight in the apartment, officers observed the defendant arrive at the house in his vehicle the night before executing the search warrant, and the vehicle was still at the residence when officers executed the warrant the next day).

Law enforcement also had not conducted surveillance of the property to establish, or at least suggest, that it was a time of day when Thomas K. Mackey would normally be at the address. Officer Norton testified that he did not have information on who all lived at 4004 French Broad. [Tr. 32]. Additionally, prior to the execution of the arrest warrant, law enforcement did not see an individual on the property or hear any suspicious noises indicating that Thomas K. Mackey was potentially present.

Therefore, the Court finds that law enforcement did not have a reasonable belief that Thomas K. Mackey was inside of the residence at the time of the initial entry into the residence. Accordingly, the Court finds that all evidence after law enforcement's initial entry into the trailer at 4004 French Broad should be suppressed.

### B.     Challenges to the Affidavit

Defendant contends that Detective Hollifield made several intentionally false statements in his affidavit for the search warrant. Defendant identifies the false statements as Detective Hollifield repeatedly indicating that "he had probable cause to believe that [Defendant], Mary Mackey, and Benjamin Ramsey were involved in a conspiracy to distribute methamphetamine." [Doc. 123 at 9]. Here, Defendant asserts that Detective Hollifield admitted during the suppression hearing that the statements were false and that, in his opinion, there was not probable cause to support a finding that any of the residents were involved in a methamphetamine conspiracy, as

36

well as that when he wrote the warrant, he did not believe that Ramsey or Mary Mackey "had anything to do with a methamphetamine conspiracy." [*Id.*].

The Government responds that Detective Hollifield relied upon his observations and training and experience, and Defendant has not identified any material misstatements or omissions that would have misled the Court. The Government asserts that "[t]he fact that the affiant included the other residents of 4004 French Broad Circle, Mary Mackey and Benjamin Ramsey, in the affidavit is immaterial to whether the affidavit established probable cause that evidence of narcotics trafficking would be present within the residence." [Doc. 124 at 6].

Under the Fourth Amendment, there must be probable cause for a search warrant to issue, and the warrant must be based on facts that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When determining whether an affidavit establishes probable cause, the Court typically considers only the information that was before the issuing judge, ie., only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

"In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A

37

defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "[O]f course, a presumption of validity [exists] with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. To be entitled to a *Franks* hearing, "a defendant must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.*

In *Crawford*, the Sixth Circuit detailed the "two questions of fact, and one of law," upon which "[a] *Franks* analysis turns:"

> The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

*Id.*

The Sixth Circuit has also extensively detailed the necessary culpability of an affiant required to warrant a *Franks* hearing, stating:

> The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id.* at 171–72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards:

> negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

### 1.    Suppression of Evidence from Entry into Trailer

First, as detailed above, the Court finds that all evidence resulting from the initial entry into the trailer should be suppressed, including the odor of marijuana at the heart of the affidavit in support of the search warrant. Additionally, the Court finds that if the odor of marijuana is not included in the affidavit, probable cause does not support the search warrant, and its is not necessary for the Court to address Defendant's *Franks* arguments.

Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted). For a search warrant to issue, an affidavit must show a likelihood that (1) the items sought are seizable by virtue of being connected with criminal activity and (2) the items will be found in the place to be searched. *United States v. O'Connor*, 723 F. App'x 302, 307 (6th Cir. 2018) (internal citations

39

omitted). A supporting affidavit must, therefore, sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). In determining whether an affidavit establishes a nexus, the undersigned begins by observing that the issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

If the initial entry into the trailer is subsequently invalidated, Detective Hollifield's affidavit does not include the "strong odor of marijuana" upon entering the residence, or Thomas K. Mackey's statement that his father goes by "Miami," sells weed, or keeps illegal narcotics and money in the safes inside of the bedroom. *See* [Doc. 93-1 at 5]. Additionally, Thomas K. Mackey's statement that the Defendant had been in federal prison for illegal narcotic violations, as well as Ramsey's statements about his father selling weed and keeping money in a safe and people stopping by very often, are also stricken from the affidavit. [*Id.* at 5–6]. Therefore, without these statements after the initial entry into the trailer, the affidavit does not establish probable cause that evidence of distributing methamphetamine and marijuana would be found within the trailer. As such, a *Franks* hearing is not necessary.

### 2.      Probable Cause Without Challenged Statements

Alternatively, if the district court disagrees with the above findings regarding the execution of the arrest warrant, the Court finds that the affidavit, even without the challenge false statements at issue, is sufficient to support a finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) ("[I]f, when material that is the subject of the alleged falsity or reckless

40

disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); *see also United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

If law enforcement had a reasonable belief that Thomas K. Mackey was inside of the residence on November 22, 2019, Detective Hollifield's affidavit includes the odor of marijuana upon entering the residence while law enforcement was present to serve a federal drug indictment. Additionally, the affidavit details that Thomas K. Mackey stated that his father goes by "Miami" and sells weed, as well as that his father keeps illegal narcotics and money in the safe inside of his bedroom and has previously been incarcerated for illegal narcotic violations. The affidavit also includes Ramsey's statements that he knew that Thomas O. Mackey sold weed and kept the drugs and money in a safe, that people stop by the residence very often, and that his father's friends look like they would be into more than just weed. While Defendant challenges the statements in the affidavit that probable cause existed as to Ramsey and Mary Mackey, the Court finds that the affidavit established probable cause that evidence of Defendant's narcotics trafficking would be located within the residence.

## IV.   CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 90**] be **GRANTED IN PART**.[5]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).